UNITED STATES DISTRICT COURT
EASTERN DISTICT OF MICHIGAN
SOUTHERN DIVISION

STEVEN SAMPSON,

                  Plaintiff,          Civil Action No.: 15-12906
                                     Honorable Paul D. Borman
                  v.              Magistrate Judge Elizabeth A. Stafford

CAROLYN W. COLVIN,
Acting Commissioner of
Social Security,

                  Defendant.

_____/

**REPORT AND RECOMMENDATION
ON CROSS MOTIONS FOR SUMMARY JUDGMENT [R. 14; R. 16]**

      Plaintiff Steven Sampson appeals a final decision of Defendant

Commissioner of Social Security ("Commissioner") denying his application

for supplemental security income benefits ("SSI") under the Social Security

Act (the "Act"). Both parties have filed summary judgment motions,

referred to this Court for a Report and Recommendation pursuant to 28

U.S.C. § 636(b)(1)(B). The Court finds that the administrative law judge's

("ALJ") decision is supported by substantial evidence, and thus

**RECOMMENDS** that:

-     the Commissioner's motion **[R. 16]** be **GRANTED**;

-     Sampson's motion **[R. 14]** be **DENIED**; and

- the Commissioner's decision be **AFFIRMED**, pursuant to sentence four of 42 U.S.C. § 405(g).

## I.   BACKGROUND

### A.   Sampson's Background and Disability Application

Sampson was 53 years old when he filed his application for SSI benefits on June 25, 2013.  [R. 10-5, Tr. 131].  He states that he dropped out of school in the fifth, sixth or seventh grade due to a learning disability. [R. 10-2, Tr. 32; R. 10-7, Tr. 181, 186, 260].  Sampson had been awarded SSI benefits when he was around 22, but lost them when he married and his wife made too much money to qualify; they divorced less than a month later.  [R. 10-2, Tr. 35; R. 10-7, Tr. 186].  After losing his benefits, Sampson worked for a short period of time at as a Forman Mills layaway clerk, but his attorney stated that he was fired because he could not remember numbers. [R. 10-2, Tr. 31; R. 10-5, Tr. 137].  In addition to his learning disability, Sampson alleged that he was disabled by back and knee pain.  [R. 10-2, Tr. 32].

After an April 14, 2014 oral hearing, Sampson's application for SSI benefits was denied in a written decision on June 19, 2014.  [*Id.*, Tr. 12-51]. The Appeals Council denied review, making the ALJ's decision the final decision of the Commissioner. [*Id.,* Tr. 1-6]. Sampson timely filed for judicial

2

review. [R. 1].

**B.** **The ALJ's Application of the Disability Framework Analysis**

A "disability" is the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 1382c(a)(3)(A).

The Commissioner determines whether an applicant is disabled by analyzing five sequential steps. First, if the applicant is "doing substantial gainful activity," he or she will be found not disabled. 20 C.F.R. § 416.920(a)(4). Second, if the claimant has not had a severe impairment or a combination of such impairments[1] for a continuous period of at least 12 months, no disability will be found. *Id.* Third, if the claimant's severe impairments meet or equal the criteria of an impairment set forth in the Commissioner's Listing of Impairments, the claimant will be found disabled. *Id.* If the fourth step is reached, the Commissioner considers its assessment of the claimant's residual functional capacity ("RFC"), and will find the claimant not disabled if he or she can still do past relevant work. *Id.* At the final step, the Commissioner reviews the claimant's RFC, age,

---

[1] A severe impairment is one that "significantly limits [the claimant's] physical or mental ability to do basic work activities." § 920(c).

3

education and work experiences, and determines whether the claimant

could adjust to other work. *Id.* The claimant bears the burden of proof

throughout the first four steps, but the burden shifts to the Commissioner if

the fifth step is reached. *Preslar v. Sec'y of Health & Human Servs.*, 14

F.3d 1107, 1110 (6th Cir. 1994). [2]

Applying this framework, the ALJ concluded that Sampson was not

disabled. At the first step, he found that Sampson had not engaged in

substantial gainful activity since his application date. [R. 10-2, Tr. 17]. At

the second step, he found that Sampson had the severe impairment of a

learning disability, but that his history of back pain and hypertension were

not severe.  [*Id.,* Tr. 17-18]. Next, the ALJ concluded that Sampson's

learning disability did not meet or equal the severity of the listed

impairments.  [*Id.,* Tr. 18-20].

Between steps three and four, the ALJ found that Sampson had the

RFC to perform a full range of work at all exertional levels, but that he was

"limited to simple, routine and repetitive tasks at level 1, performed in a

work environment free of fast paced production requirements, involving

only simple work-related decisions, and with few, if any work place

---

[2] Opinions analyzing applications for Disability Insurance Benefits are
applicable because the same standards apply to SSI claims.  *See* 20
C.F.R. §§ 404.1520 and 416.920.

changes.  The claimant has great difficulty with reading and writing." [*Id.,* Tr. 20].

At the fourth step, the ALJ found that Sampson had no past relevant work.  [*Id.*, Tr. 23].  After considering Sampson's age, education, work experience, RFC, and the testimony of the VE, the ALJ found at step five that Sampson could perform a significant number of other jobs in the national economy, including box folder, and greenhouse vine pruner/flower picker.  [*Id.*, Tr. 23-24].  Thus, the ALJ found that Sampson was not disabled.

## II.    ANALYSIS

### A.

Pursuant to § 405(g), this Court's review is limited to determining whether the Commissioner's decision is supported by substantial evidence and was made in conformity with proper legal standards. *Gentry v. Comm'r of Soc. Sec.*, 741 F.3d 708, 722 (6th Cir. 2014). Substantial evidence is "more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (internal quotation marks and citation omitted). Only the evidence in the record below may be considered when determining

whether the ALJ's decision is supported by substantial evidence. *Bass v. McMahon*, 499 F.3d 506, 512-13 (6th Cir. 2007).

The significant deference accorded the Commissioner's decision is conditioned on the ALJ's adherence to governing standards. "Chief among these is the rule that the ALJ must consider all evidence in the record when making a determination, including all objective medical evidence, medical signs, and laboratory findings." *Gentry*, 741 F.3d at 723.  *See also Rogers*, 486 F.3d at 249. In other words, substantial evidence cannot be based upon fragments of the evidence, and "must take into account whatever in the record fairly detracts from its weight." *Garner v. Heckler*, 745 F.2d 383, 388 (6th Cir. 1984) (internal quotation marks and citation omitted).

The Commissioner must also adhere to its own procedures, but failure to do so constitutes only harmless error unless the claimant has been prejudiced or deprived of substantial rights. *Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647, 654 (6th Cir. 2009). On the other hand, substantial errors like ignoring evidence in the record or failing to follow the treating physician rule are not harmless. *Id.*; *Cole v. Astrue*, 661 F.3d 931, 940 (6th Cir. 2011); *Gentry*, 741 F.3d at 729.

Sampson argues that the ALJ erred by finding his back and hypertension impairments non-severe, by failing to develop the record, by

6

not considering his lack of medical insurance, by making a flawed credibility determination, and by failing to assess a more restrictive RFC. The Court disagrees and finds that substantial evidence supports the ALJ's decision.

**B.**

The medical evidence in the record is sparse.  It shows that Sampson had uncontrolled hypertension due to his noncompliance with his medications in 2008, and knee and back pain for which he was prescribed Vicodin and Motrin in 2009 to 2010.  [R. 10-7, Tr. 192-203, 209].  An x-ray of his lumbar spine revealed degenerative changes without evidence of fracture, while his knee x-ray was normal.  [*Id.*, Tr. 211-12].  A July 2009 echocardiogram had "mild," "trace" and "abnormal" results, [*Id.*, Tr. 210], but there is no evidence of any recommended limitations or follow-up.  In April 2012, Sampson sought emergency care at St. John Hospital after he slipped and fell.  [Id., Tr. 242].  An x-ray of his lumbar spine showed a "mild compression deformity along the superior endplate of L3 may represent an acute fracture."  [*Id.,* Tr. 244].

Following Sampson's June 2012 application for SSI benefits and prior to the hearing before the ALJ, he received three independent medical examinations (IME), with the first being conduct by Katherine Karo, D.O., in September 2012; she assessed his physical functionality.  [R. 10-7, Tr.

7

174-80].  He complained of low back pain for the preceding six months, but stated that he had had no diagnostic work-up or treatment.  [*Id.*, Tr. 174]. Sampson ambulated without an assistive device, could endure sitting, standing and walking for 45 minutes each, and took no medications.  [*Id.*]. He reported living with his mother, and stated that he was independent with basic activities of daily living, while dependent on his mother for more advanced activities.  [*Id.*].  Sampson's blood pressure was 170/120.  [*Id.*]. But Dr. Karo's review of systems revealed no abnormalities:  he showed no loss of balance of falling, no head injury headaches or dizziness; no issues with his eye, ears, nose, mouth or throat; no issues with his respiratory, cardiovascular, genitourinary, endocrine, extremities, neurological systems; no evidence of focal muscle atrophy in upper or lower extremities, and neither his range of motion nor muscle strength testing was limited by pain. [*Id.*, Tr. 174-75].  Sampson's musculoskeletal examination was normal, with no tenderness to palpation, no muscle spasm and no significant muscle atrophy.  [*Id.*].  Dr. Karo concluded from the IME, "The patient is able to ambulate without any assistance [sic] device.  The patient is able to do heel walk, toe walk, tandem walk.  The patient can sit and stand without assistance.  The patient is able to bend, stoop, carry, push and pull."  [*Id.,* Tr. 175-76].

8

Sampson was seen by David Hayter, Ph.D., for a mental IME in September 2012.  [R. 10-7, Tr. 181-85].  He reported to Dr. Hayter that he was on no medication, and that he watches television, sits on the porch, takes out the trash and does dishes.  [*Id.*, Tr. 182].  Testing showed that Sampson had a full scale IQ of 56, which fell in the mildly mentally retarded range, but Dr. Hayter opined, "Perhaps best effort had not been obtained during the clinical examination today.  The test appears to be invalid and unreliable."  [*Id.*, Tr. 184].  Dr. Hayter diagnosed Sampson with adjustment disorder, and issued a Global Assessment of Function (GAF) score of 60, suggesting moderate limitations.[3]  According to Dr. Hayter, Sampson was able to acquire and use information, demonstrated the ability to attend to task and interact appropriately, was able to care for himself, ask questions, and understand, retain and follow simple instructions, but was restricted to simple routine, repetitive and concrete tasks, and could not manage his own funds.  [*Id.*, Tr. 185].

Nick Boneff, Ph.D., conducted another mental IME in July 2013.  [R.

---

[3] "The GAF scale is a method of considering psychological, social, and occupational function on a hypothetical continuum of mental health. The GAF scale ranges from 0 to 100, with serious impairment in functioning at a score of 50 or below. Scores between 51 and 60 represent moderate symptoms or a moderate difficulty in social, occupational, or school functioning." *Norris v. Comm'r of Soc. Sec.*, No. 11–5424, 461 Fed. Appx. 433, 436 n.1 (6th Cir. 2012).

10-7, Tr. 186-89]. At that time, Sampson stated that he was on Lisinopril (an ACE inhibitor) and baby aspirin. Sampson's full scale IQ was found to be 42, but Dr. Boneff found those results invalid. [*Id.*, Tr. 189]. "[H]e scored extremely low in all areas of cognitive functioning, much lower than in the prior evaluation as mentioned and with no strengths noted today. Once again my impression is the score reflect an almost total lack of effort on his part during the evaluation." [*Id.*]. This opinion was buttressed by the "massive drop from prior IQ results." [*Id.*]. Dr. Boneff assessed a GAF of 51 and a fair prognosis, could not determine whether Sampson could manage his own money, and found that Sampson "would appear to have sufficient cognitive strengths to be able to engage successfully in work activities of at least a simple nature, if and as motivated to do so which is questionable in light of his presentation today." [*Id.*]

The only other medical evidence from between submitting the application and the hearing are three emergency room visits at St. John Hospital. In June 2013, Sampson appeared with a headache, and it was noted that he had not been taking his blood pressure medication "for a while." [R. 10-7, Tr. 235-36]. A CT scan of his head found no acute intracranial abnormality and mild periventricular hypodensities that are "commonly seen in chronic small vessel ischemic disease." [*Id.*, Tr. 238].

10

He returned to the emergency room two months later with another

headache, having run out of blood pressure medication.  [*Id.*, Tr. 231-32].

A repeat CT scan was similar to the one the prior June, but also with

atherosclerotic changes in the anterior circulation.  [*Id.*, Tr. 234].  Finally, in

January 2014, Sampson reported to the emergency room with lower back

pain since the prior night, and an x-ray revealed old, mild compression

deformity involving L3, with the rest of the vertebral bodies and disc spaces

being well-preserved with mild degenerative changes.  [*Id.*, Tr. 225-26,

228].

During the hearing, the ALJ struggled with the minimal record with

which he had to make a decision, noting that Sampson had not had

treatment for his back since 2012, and stating, "I'd like to help him, I'm in a

little bit of a bind with regards to try to get some, you know, some

documentation."  [R. 10-2, Tr. 37-38].  Yet, Sampson attorney denied

wanting to submit any additional evidence.  [*Id.*, Tr. 31].  The ALJ

discussed with Sampson's attorney whether he should send Sampson for a

second IME regarding his claimed physical impairments, but ultimately

decided to send him for a third IME to evaluate his alleged mental

impairments given the mixed results of the first two mental IMEs.  [*Id.*, Tr.

39-40, 50].  Sampson's attorney argued that the lack of records from the

relevant time period pertaining to his alleged back impairment was the result of a lack of insurance, but he did not object to doing another IME only regarding the alleged learning disability. [*Id.*, Tr. 36-40, 50].

After Dr. Boneff conducted the post-hearing mental IME in April 2014, he concluded that Sampson was not an accurate historian and was exaggerating his cognitive difficulties. [R. 10-7, Tr. 261]. Dr. Boneff's testing placed Sampson in the moderately retarded range with a full scale IQ of 40, and he scored the lowest score possible on all ten subtests. [*Id.*, Tr. 262]. Opining that Sampson was an "individual who clearly seems to not put forth his best efforts during the evaluations, which cast great doubt on the validity of today's test scores," Dr. Boneff could not assess Sampson's diagnosis, prognosis or ability to perform work-related activities. [*Id.*, Tr. 262-66].

This evidence fails to substantiate that Sampson suffered from work-related limitations during the relevant time period and as a general matter provides substantial evidence in support of the ALJ's determination that he is not disabled. Further, as described below, Sampson's specific arguments are unavailing.

## C.

Sampson complains that the ALJ erred in finding that his back pain

and hypertension were non-severe impairments and in assessing his RFC.[4]

In evaluating these arguments, the Court is constrained to consider the

evidence regarding Sampson's conditions for the time period after his June

2012 SSI application was filed.  "The proper inquiry in an application for

SSI benefits is whether the plaintiff was disabled on or after [his] application

date." *Casey v. Sec'y of Health & Human Servs.*, 987 F.2d 1230, 1233 (6th

Cir. 1993).  *See also Hibbard v. Astrue*, 537 F. Supp. 2d 867, 873 (E.D. Ky.

2008) ("[E]vidence indicating only that an impairment may have been

severe prior to the onset date, but not also indicating that this impairment

could still be considered severe on or after this date, does not undermine a

finding of no severity.").  Having said that, "medical evidence that predates

the period of alleged disability may be, and ought to be, considered insofar

as it bears on the claimant's condition after the onset of disability."  *Moore*

*v. Comm'r of Soc. Sec.*, No. 11-11857, 2013 WL 1278478, at *3 (E.D. Mich.

Mar. 26, 2013).  Sampson has the burden of demonstrating that his back

pain and hypertension are severe and prevented him from performing

medium work.  *Preslar v. Sec'y of Health & Human Servs.*, 14 F.3d 1107,

---

[4] Sampson's claimed that the ALJ erred in finding that he could perform medium work, [R. 14, Tr. 346], but the ALJ actually found that he could perform work at all exertional levels, [R. 10-2, Tr. 20].  The Court construes this argument as being that the ALJ's RFC is not supported by substantial evidence.

1110 (6th Cir. 1994) (claimant bears burden during first four steps); *Jordan v. Comm'r of Soc. Sec.*, 548 F.3d 417, 423 (6th Cir. 2008) (claimant bears burden of demonstrating need for more restrictive RFC).  He did not carry these burdens.

The ALJ acknowledged Sampson's history of back pain and hypertension, but accurately concluded that "[t]he record notes no ongoing significant symptoms, treatment or limitations related to these conditions." [R. 10-2, Tr. 17].  The ALJ correctly stated that the x-rays found "mild" compression deformity and degenerative changes, that Sampson did not take any medication for pain and that his IME with Dr. Karo rendered entirely normal results.  [*Id.*]. With respect to Sampson's hypertension, the ALJ reasonably considered the fact that Sampson's two emergency room visits in 2013 were caused by his lack of compliance with his blood pressure medications.  [*Id.*].

Sampson cites to his diagnoses as undermining the ALJ's findings, but he does not provide evidence that they result in specific limitations.  His diagnoses say nothing about their severity or impact on his ability to perform work activities. *Higgs v. Bowen*, 880 F.2d 860, 863 (6th Cir. 1988); *Kennedy v. Astrue*, 247 Fed. Appx. 761, 767 (6th Cir. 2007).  Notably, Sampson alleged nowhere in the record that he suffers from any specific

limitations due to his back pain or hypertension, except to state that his back bothers him "a lot," especially when getting up and down.  [R. 10-2, Tr. 41].  In fact, he told Dr. Karo that he is independent with respect to his basic activities of daily living, and he told Dr. Hayter that he takes out the trash and washes the dishes.[5]  [R. 10-7, Tr. 174, 182].  And during his emergency room visits in 2012 and 2013, he described his pain as being recent in its onset, not constant.  [R. 10-7, Tr. 225, 231-32, 235-36, 242].

Sampson argues that the ALJ improperly dismissed his explanation that he did not have more medical evidence from the relevant time period due to a lack of medical insurance.  But again, Sampson has not alleged that he was suffering from any specific functional limitations as a consequence of those conditions.  Even if he had, the ALJ was entitled to consider the lack of medical treatment.  "In the ordinary course, when a claimant alleges pain so severe as to be disabling, there is a reasonable expectation that the claimant will seek examination or treatment. A failure to do so may cast doubt on a claimant's assertions of disabling pain." *Strong v. Soc. Sec. Admin.,* 88 Fed. Appx. 841, 846 (6th Cir. 2004).  In *Rainey-Stiggers v. Comm'r of Soc. Sec.*, No. 1:13CV517, 2015 WL

---

[5] Contrary to this report, Sampson testified during the hearing that he did no chores, suggesting that he was incapable of understanding how to do them.  [R. 10-2, Tr. 34].

15

729670, at *9 (S.D. Ohio Feb. 19, 2015), the ALJ did not err in taking into consideration the claimant's lack of treatment when she had sought treatment at an emergency room on a few occasions without additional treatment being recommended by a physician, and with no evidence that the claimant sought but was denied free or subsidized medical treatment. The same analysis applies here.

For these reasons, Sampson has not carried his burden of demonstrating that his back pain and hypertension were severe or required a more restrictive RFC.

**D.**

Sampson's argument that the ALJ failed in his duty to supplement the record is equally meritless.  As a general rule, "[t]he burden of providing a complete record, defined as evidence complete and detailed enough to enable the Secretary to make a disability determination, rests with the claimant." *Landsaw v. Sec'y of Health & Human Servs.*, 803 F.2d 211, 214 (6th Cir. 1986) (citing 20 C.F.R. §§ 416.912, 416.913(d)).  But "[w]here there are obvious gaps in the record, the ALJ has the duty to develop the administrative record with respect to the missing evidence." *Kendall v. Astrue*, No. CIV.A. 2:10-263-DCR, 2011 WL 4388794, at *5 (E.D. Ky. Sept. 20, 2011).  Courts evaluate whether an ALJ has failed to fully develop the

record on a case-by-case basis*. Umara v. Comm'r of Soc. Sec.*, No. 2:12-CV-1119, 2013 WL 6001003, at *4 (S.D. Ohio Nov. 12, 2013), *adopted by* 2014 WL 116370 (S.D. Ohio Jan. 10, 2014).

Despite having told the ALJ that he did not want to add any evidence to the record, [R. 10-2, Tr. 31], Sampson now argues that the ALJ had a duty to complete the record by accessing the records from his old SSI application and school records.  That argument was waived. *Smoot v. United Transp. Union*, 246 F.3d 633, 648 (6th Cir. 2001) ("Because Plaintiff failed to object to the award of attorneys' fees below, under the waiver rule this Court will not consider Plaintiff's claim.").  Besides, although it was Sampson's duty to complete the record, he acknowledges that he submitted the school records only to the Appeals Council.  [R. 14, Tr. 342-43].  Given that, this Court cannot consider the school records. *Cline v. Comm'r of Soc. Sec.*, 96 F.3d 146, 148 (6th Cir. 1996) ("[W]here the Appeals Council considers new evidence but declines to review a claimant's application for disability insurance benefits on the merits, the district court cannot consider that new evidence in deciding whether to uphold, modify, or reverse the ALJ's decision.").  Since the school records existed at the time of the hearing before the ALJ, the Court also has no authority to remand this matter to the ALJ to consider them. *Foster v.*

17

*Halter*, 279 F.3d 348, 357 (6th Cir. 2002) (court may remand for consideration of only new evidence).

### E.

Sampson's argument that the ALJ made an improper credibility determination invites the Court to reweigh the evidence.  He protests that the ALJ should not have relied upon Dr. Karo's conclusion that he could perform basic activities of daily living, and that there was sufficient evidence to "permit validity of the IQ scores as such scores are consistent with Plaintiff's lack of adaptive functioning."  [R. 14, Tr. 345].  Even if Sampson's view of the evidence had credence, the question before the Court is whether the ALJ's decision is supported by substantial evidence. *Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994) ("If the [Commissioner's] decision is supported by substantial evidence, it must be affirmed even if the reviewing court would decide the matter differently, and even if substantial evidence also supports the opposite conclusion.") (internal citations omitted). Sampson's argument fails to make even a colorable claim that the ALJ's decision was not supported by substantial evidence.

### III.   CONCLUSION

For the reasons stated above, the Court **RECOMMENDS** that the Commissioner's motion **[R. 16]** be **GRANTED**; that Sampson's motion **[R. 14]** be **DENIED**; and that the Commissioner's decision be **AFFIRMED**, pursuant to sentence four of 42 U.S.C. § 405(g).

s/Elizabeth A. Stafford<br>
ELIZABETH A. STAFFORD<br>
United States Magistrate Judge

Dated: August 3, 2016

## NOTICE TO THE PARTIES REGARDING OBJECTIONS

Either party to this action may object to and seek review of this Report and Recommendation, but must act within fourteen days of service of a copy hereof as provided for in 28 U.S.C. § 636(b)(1) and Fed. R. Civ. P. 72(b)(2).  Failure to file specific objections constitutes a waiver of any further right of appeal.  *Thomas v. Arn*, 474 U.S. 140 (1985); *Howard v. Secretary of HHS*, 932 F.2d 505 (6th Cir. 1991)*; United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).  Filing objections which raise some issues but fail to raise others with specificity will not preserve all objections that party might have to this Report and Recommendation.  *Willis v. Secretary of HHS*, 931 F.2d 390, 401 (6th Cir. 1991); *Smith v. Detroit Fed'n of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir. 1987).  A copy of any objection

must be served upon this Magistrate Judge. E.D. Mich. LR 72.1(d)(2).

Each **objection must be labeled** as "Objection #1," "Objection #2,"

etc., and **must specify** precisely the provision of this Report and

Recommendation to which it pertains.  Not later than fourteen days after

service of objections, **the non-objecting party must file a response** to

the objections, specifically addressing each issue raised in the objections in

the same order and labeled as "Response to Objection #1," "Response to

Objection #2," etc.  The response must be **concise and proportionate in**

**length and complexity to the objections**, but there is otherwise no page

limitation.  If the Court determines that any objections are without merit, it

may rule without awaiting the response.


## CERTIFICATE OF SERVICE

The undersigned certifies that the foregoing document was served upon counsel of record and any unrepresented parties via the Court's ECF System to their respective email or First Class U.S. mail addresses disclosed on the Notice of Electronic Filing on August 3, 2016.

s/Marlena Williams
MARLENA WILLIAMS
Case Manager
